Scott Dawn CARPENTER, Petitioner,

v.

STATE of Oklahoma, Respondent.

No. C–95–0057.

Court of Criminal Appeals of Oklahoma.

Nov. 7, 1996.

Rehearing Denied Jan. 22, 1997.

Paul S. Faulk, Steve Nash, Capital Trial Division, Okla. Indigent Defense System, Norman, for Defendant at trial.

Thomas C. Giulioli, District Attorney, O.R. Barris, III, Assistant District Attorney, Eufaula, for the State at trial.

Anne M. Moore, Division Chief, Capital, Direct Appeals Division, Oklahoma Indigent Defense System, Norman, for Petitioner on appeal.

W.A. Drew Edmondson, Attorney General, William L. Humes, Asst. Attorney General, Oklahoma City, for Respondent on appeal.

## OPINION DENYING PETITION FOR CERTIORARI

LANE, Judge:

On February 10, 1994, Petitioner Scott Dawn Carpenter was charged with Malice Murder, or, in the alternative, Felony Murder, in connection with the death of A.J. Kelley. On August 18, 1994, the State announced its intention to seek the death penalty. On September 19, 1994, the first day of trial, Petitioner entered a plea of nolo contendere to First Degree Murder in Case No. F–94–18, in the District Court of McIntosh County, before the Honorable Robert A. Layden, District Judge. A sentencing hearing was held November 13, 1994. At the conclusion of the hearing Judge Layden found the existence of the sole aggravating circumstance alleged, that the murder was committed to avoid arrest and prosecution, and sentenced Petitioner to death. Formal judgment and sentence was pronounced at a sentencing hearing held December 16, 1994, over defense counsel's objections, as Petitioner had escaped from jail and was not present at the sentencing. On December 27, 1994, counsel filed a motion to withdraw plea on behalf of Petitioner. The motion was argued on February 7, 1995, before the Honorable Steven W. Taylor, and denied.

On December 12, 1995, Petitioner filed his application requesting this Court grant his petition for a writ of certiorari and reverse the trial court's ruling refusing to allow him to withdraw his plea. From this judgment and sentence Petitioner has perfected this appeal.

Petitioner raises the following propositions of error [1] in support of his writ:

I. Petitioner's First Degree Murder conviction is void because the Information did not allege the essential elements of first degree felony murder, thereby failing to confer subject matter jurisdiction on the district court in violation of Petitioner's rights under the Fourteenth Amendment and Article II, §§ 7, 17, and 20 of the Oklahoma Constitution;

II. Petitioner's Sixth Amendment right to counsel and his rights protected by the Due Process Clause of the Fourteenth Amendment were violated when the trial court imposed judgment and sentence in absentia, thereby rendering Petitioner's convictions and sentence null and void for lack of jurisdiction;

III. Petitioner's due process and Eighth Amendment rights were violated when the State ignored this Court's directive in Hunter and filed a Bill of Particulars three months after formal arraignment and one month before trial;

IV. The District Attorney abdicated his duty to exercise impartial discretion in filing a Bill of Particulars and in plea negotiations and, instead, acted as a special prosecutor advocating the interests of and controlled by the victim's family in violation of Oklahoma law and Petitioner's rights under the Eighth and Fourteenth Amendments;

V. Petitioner's due process and Eighth Amendment rights were violated, because the evidence was insufficient to prove a murder committed for the purpose of avoiding arrest or prosecution, the only aggravating circumstance alleged by the State;

VI. Petitioner's nolo contendere plea was not knowing and voluntary because the trial court improperly advised Petitioner on the elements of the charge of First Degree Felony Murder and the plea was not supported by a sufficient factual basis in violation of Petitioner's rights protected by the Eighth and Fourteenth Amendments;

---

1. Petitioner alleges ten propositions of error, each containing multiple sub-propositions. Only the main proposition of error listed for each alleged error is listed below. For the record, all of Petitioner's propositions of error were reviewed and considered by this Court.

VII. Petitioner's nolo contendere plea was involuntary because it was induced by the deficient performance of counsel in violation of his Sixth Amendment rights and, therefore, Petitioner's plea was obtained in violation of his due process rights protected by the Fourteenth Amendment;

VIII. The District Judge who presided at the hearing on Petitioner's motion to withdraw his nolo contendere plea exceeded and abused his authority and violated Petitioner's rights protected by the Fourteenth Amendment;

IX. Petitioner's death sentence is inherently unreliable and cannot stand under the Eighth and Fourteenth Amendments or Oklahoma's statutory scheme because the evidence in mitigation outweighed the evidence in aggravation and because the trial court was not aware at the time of sentencing that it could enter a sentence less than death despite a finding that the aggravating circumstance outweighed the mitigating circumstances; and,

X. Petitioner's death sentence must be vacated because the use of victim impact evidence at his sentencing proceedings violated his rights under the Eighth and Fourteenth Amendments.

### *FACTS*

On February 6, 1994, at approximately 5:30 p.m., retired Oklahoma City police officer Jim Parsons and his friend Jerry Yort drove to the Dutchess Creek Bait and Grocery Store, located at Porum Landing, Lake Eufaula, Oklahoma, to return an empty beer keg. Parsons was the store's previous owner and had sold it to the present owner, A.J. Kelley, some years earlier. Parsons and Yort noticed an older model Ford pickup truck parked at a gas pump when they drove up. Carrying the empty keg, Parsons and Yort entered the store, where Parsons proceeded to yell out Kelley's name. Kelley did not answer.

As the two men walked to the rear of the store Petitioner met them at the door of the minnow room. Asking where Kelley was, Petitioner told Parsons the store owner was in the cooler, located on the other side of the store. Parsons tried to enter the minnow room, but Petitioner blocked the way, stating that Kelley did not allow anyone in the back room. Parsons noticed that Petitioner seemed nervous and that he had water dripping from his hands. Parsons and Yort backed out of the store and remained outside for several minutes. Petitioner remained inside. During this time, Yort wrote down the tag number of the pickup truck and a description of the vehicle.

Two other customers entered and subsequently left the store. Petitioner exited the store after these customers left. He walked to the Ford pickup and drove away. Parsons noticed a drop of blood on one of Petitioner's shoes as he left the store. Upon reentering the store, Parsons discovered Kelley lying between two compressors in the minnow room with a wound to his neck. Parsons pursued Petitioner in his vehicle while Yort phoned for assistance. Parsons lost sight of Petitioner, returned to the store, and he and Yort secured the crime scene until police arrived.

On the store's counter Parsons found a paper bag containing warm corn dogs, cigarettes, and chewing tobacco. There was no money missing from the cash registers, but the gas pump indicated approximately thirty-seven dollars ($37) worth of gas had been dispensed from one of the fuel pumps. The cash register tape also showed an incomplete sales transaction amounting to approximately forty-three dollars ($43)

Petitioner was stopped in Stigler, Oklahoma, a short distance away from the bait store. Upon being questioned, Petitioner confessed to stabbing Kelley, professing that he did not know why he had stabbed the victim. He also indicated that he had not taken anything from the store.[2]

Testimony at the sentencing hearing indicated that Petitioner had been seen in at least three other convenience/bait/grocery type establishments earlier in the day, staying several minutes in each, leaving each

---

**2.** Petitioner admitted to filling his truck with gas, accounting for the $37 fuel transaction.

without buying anything. His behavior was described by store owners and/or workers as "unusual" and prompted one person to write down Petitioner's physical description. He returned to some of the stores several times that day, never buying anything, but never acting improperly toward any of the individuals in those establishments. Petitioner was known to most of the store owners and/or workers who saw him that day as he had frequented the various stores on a regular basis.

Petitioner was described by numerous individuals as quiet, easy-going, respectful, cooperative, non-aggressive, pleasant, polite, a good student and non-violent. He had no prior arrests or convictions, and attended church with his family. Teachers and fellow students expressed their disbelief upon discovering that Petitioner had been charged with the murder.

Dr. Phillip Murphy, a clinical psychologist, testified on Petitioner's behalf. Dr. Murphy opined that Petitioner suffers from some sort of brain damage,[3] which increases his likelihood of suffering a seizure. He diagnosed Petitioner as suffering from a complex partial temporal lobe seizure at the time he committed the murder. These seizures, according to Dr. Murphy, are often accompanied by memory loss and confusion. Dr. Murphy testified there was nothing in Petitioner's past medical history indicating he had ever suffered such a seizure, nor was there any other evidence presented indicating Petitioner had experienced any seizures, at any time. Dr. Murphy also admitted on cross-examination that he could not state for certain that Petitioner had suffered a seizure at the time he killed Kelley, only that the possibility existed.

■ Petitioner claims as his first proposition of error that the Information charging felony murder is defective because it did not allege the essential elements of the underlying felony of robbery with a dangerous weap-

on and thus failed to confer subject matter jurisdiction on the district court. In support of his argument, Petitioner cites to *Tiger v. State*, 900 P.2d 406 (Okl.Cr.1995), *Pickens v. State*, 885 P.2d 678, 683–684 (Okl.Cr.1994) and *Miller v. State*, 827 P.2d 875, 879 (Okl. Cr.1992). He further claims that the defect cannot be waived because it is jurisdictional.

■ In *Parker v. State*, 917 P.2d 980 (Okl. Cr.1996) we reviewed our rulings in *Tiger* and *Miller* and held that an information need not allege each element of a crime in order to confer jurisdiction. Rather, the question is whether the information gives the defendant notice of the charges against him and apprises him of what he must defend against at trial. *Id.* at 985. The Information here alleged in the alternative that Petitioner was guilty either of malice murder or felony murder.

In pertinent part the Information charging Petitioner with felony murder read as follows:

"that the said defendant did unlawfully, regardless of malice, while in the commission of the crime of Robbery with a Dangerous Weapon take the life of A.J. Kelley, a Human Being, by means of a knife held in the hands of the said Defendant and with which the said defendant did stab the body of the said A.J. Kelley from which mortal wounds the said A.J. Kelley did languish and die, . . ."

The Information here gave the Petitioner sufficient notice of the charges against him. It recited the name of the Petitioner, the date, place, weapon, and method of the crime, identified the crime victim and specified the statutes under which Petitioner was being charged. Petitioner entered a nolo contendere plea to the charges filed against him. At the hearing where Petitioner entered his plea, he testified that he knew all of the elements of the crime(s) he was charged with and that if he chose to go to trial the burden was on the State to prove each of the

---

**3.** Petitioner suffered a brain injury when he was about six years old. He was struck by a nail in the right temporal lobe which became infected, resulting in meningitis. From that time until just two months before the murder, Petitioner suffered four other significant head injuries. Mur-

phy stated that seizures of the type Petitioner may suffer from are successfully treated with medication. There was no testimony that Petitioner had ever suffered such a seizure, either before or after the killing.

elements of the crime(s). We are hard pressed to find now that Petitioner did not know all of the elements of the crimes he was charged with when he specifically testified to the contrary. We find no error here.[4]

At Proposition II, Petitioner alleges it was error for the trial court to impose formal judgment and sentence because he was not present at the time of sentencing. Petitioner admits that he was absent from the hearing because he had escaped from the county jail where he was being held, but claims that the reason for his absence from the sentencing is irrelevant, and that the judgment and sentence as formally entered are null and void[5] and should be vacated. He further claims that the imposition of the sentence deprived him of his due process rights in that it triggered the time period within which he was required to withdraw his plea if he so decided. The trial court proceeded with the judgment and sentencing hearing over the objections of defense counsel.

It should be noted here that Petitioner was recaptured and returned to custody shortly after the sentencing hearing, and ultimately filed a motion to withdraw his plea, which was heard, and denied, by the district court. As we have noted on numerous occasions, a party complaining of error must show not only that some error occurred, but also that some injury resulted from the error. *Elmore v. State,* 846 P.2d 1120, 1123 (Okl.Cr.1993); *Crawford v. State,* 840 P.2d 627, 634 (Okl.Cr.1992); *Edington v. State,* 806 P.2d 81, 83 (Okl.Cr.1991); *Cook v. State,* 650 P.2d 863, 868 (Okl.Cr.1982); *Harrall v. State,* 674 P.2d 581, 583 (Okl.Cr.1984). Petitioner's requested relief for this alleged error is that he be resentenced, at another formal sentencing, and be allowed to file another motion to withdraw his plea. Since Petitioner filed the original withdrawal motion, and was given an extensive hearing on the same, we are unable to discern any injury he may have suffered by being sentenced in absentia.

We find no reversible error here. Petitioner's cited authorities are factually distinct from the instant case, involving situations where the defendant did not appear at all, either in person or through counsel, or was ill and unable to attend, or requested that he be allowed to attend, and his request was denied. In short, the involuntary absence of the defendants in these cases is a far cry from Petitioner's voluntary absence occasioned by his escape from custody. Likewise, the cases cited by the State all involve instances of the defendant's absence from a proceeding after it had already begun. Thus, as we noted in *Gregg v. State,* 844 P.2d 867, 876–77 (Okl.Cr.1992), a defendant may waive his right to be present in court during trial, and that presence is waived by voluntary absence.

In this case, Petitioner purposefully absented himself from the proceedings prior to the commencement of the sentencing hearing, and now seeks to complain because he was not present. Even if we find it was error to sentence Petitioner in absentia, we find it harmless in that Petitioner did file his motion to withdraw and was granted a hearing on the same. Any right to be present was waived by his voluntary absence.

Petitioner claims at Proposition III that he was denied his due process rights when the State filed its Bill of Particulars three months after formal arraignment and one month before trial. Citing *Hunter v. State,* 829 P.2d 64, 65 (Okl.Cr.1992), Petitioner filed a motion to have the Bill stricken on various grounds. The motion was heard by the district court and overruled. Once again, Petitioner's complaint is not one of prejudice or injury, but more one of failure to follow what he claims is appropriate procedure. In *Hunter,* we required a Bill of Particulars to be filed at or prior to arraignment, with the time being extended should the trial court, in its discretion, determine there is good cause for such an extension. In *Marquez v. State,* 890 P.2d 980, 982 (Okl.Cr.1995) we clarified

---

4. This author applies the above reasoning as a result of *stare decisis*. Otherwise, I would find no error for the reason expressed in my concurring in results in *Parker.*

5. Petitioner was aware that the sentence to be imposed was death as the trial court had announced that decision at the initial sentencing hearing held approximately six weeks prior to the formal judgment and sentencing hearing.

*Hunter,* noting that the defendant is entitled to be notified within a reasonable amount of time prior to trial that the death penalty is being sought. There is nothing in Petitioner's record that leads this Court to believe that the month's notice in the filing of the Bill of Particulars was insufficient. Defense counsel did not request a continuance or additional time to prepare, and when asked, announced ready for trial. Both parties admit that there was ongoing discussion, until the filing of the Bill, as to whether or not the death penalty would be pursued.

In defending its failure to file the Bill at arraignment, the State indicated it was waiting to file until it received reports from Petitioner's experts, aware that he was pursuing a diminished capacity defense. The trial court apparently found this to be "good cause." We will not second guess that ruling, and find no reversible error here.

■ At Proposition IV Petitioner claims the district attorney acted as a special prosecutor in seeking the death penalty by allowing his decision to seek the death penalty to be controlled by the wishes of the victim's family. There is no dispute that the district attorney here consulted the victim's family during plea negotiations with Petitioner. However, his consultation with the family concerning their feelings is hardly proof that the district attorney, as claimed by Petitioner, allowed the victim's family to completely control all decisions concerning plea negotiations. The record reflects that the district attorney consulted with the victim's family and conveyed to Petitioner that the family considered a plea arrangement of life to be unacceptable. However, the district attorney also testified that he never seriously considered offering Petitioner a life sentence as he felt it was not appropriate in this case.

■ Regardless, Petitioner's characterization of the district attorney as a "special" or "private" prosecutor is inapposite here. The record reflects that the State's counsel was, at all times, in control of the case before us. The fact that he consulted the victim's family and kept them informed, at all times, of the case's progress, is not *prima facie* evidence he abdicated his role as prosecutor and assumed the role of avenger. It is well established that the State is under no obligation to plea bargain with a defendant. *State ex rel. Stout v. Craytor,* 753 P.2d 1365, 1368 (Okl.Cr.1988). Likewise, the decision whether to prosecute and what charge to file is within the discretion of the prosecutor. *Id.*

Nothing in Petitioner's argument persuades this Court that the decision to pursue the death penalty in this case was either improper and/or unsupported by the law and facts. Moreover, even if Petitioner could quantify and document the extent to which the victim's family participated in any decision concerning the charging and prosecution of this case, he alleges nothing which shows that the course of action pursued by the State would have been any different had the family been absent during the entire process. Additionally, Petitioner has cited no supporting authorities to bolster his position that it is improper to advise a victim's family of case developments, or to consider their feelings regarding the case.

We agree that had the State appointed a special prosecutor, abdicated its duty by formally delegating its authority to another to prosecute the case, or allowed the family to hire private counsel to represent them, then Petitioner's cited authorities as to the impropriety of engaging the services of a special prosecutor would have been relevant. There was no special prosecutor and the victim's family did not hire their own counsel to represent them. Likewise, the citation to *Robison v. Maynard,* 829 F.2d 1501 (10th Cir.1987) is inapplicable here. That case dealt with the exclusion of testimony from the victim's family members as to whether the death penalty was the appropriate punishment. That is not the case before this Court, and it does not support the argument advanced by Petitioner. We find no error here.

■ At Proposition V, Petitioner claims his due process rights were violated because the evidence presented was insufficient to prove the murder was committed for the purpose of avoiding arrest or prosecution. It is significant that this is the only aggravating factor alleged by the State. Petitioner's

claim is that his statement to the police that he did not know why he killed Kelley was sufficient to establish he did not kill Kelley to avoid arrest or prosecution. Petitioner further claims the statement to police precludes the use of circumstantial evidence to prove his intent to avoid arrest, and even if used, the circumstantial evidence must rule out all other hypotheses except the murder to avoid arrest aggravator, citing *Snow v. State*, 876 P.2d 291, 299 (Okl.Cr.1994).

■ While Petitioner is correct in his assertion that the murder-to-avoid-arrest aggravating circumstance is determined by establishing the accused's intent, he is incorrect in his claim that once the accused makes a statement indicating his intent, the evidence of intent to kill to avoid arrest or prosecution may not be inferred from circumstantial evidence. Petitioner's statement to the police was admitted as evidence. In that statement, he confessed to killing Kelley, but stated that he did not know why he had done it. That statement is direct evidence. ("Testimony that accused [sic] admitted having committed the offense is of the nature of direct evidence of his guilt." *Nichols v. State*, 418 P.2d 77, 84 (Okl.Cr.1966).) Likewise, the evidence used to prove the aggravator alleged by the State was circumstantial.

In light of the foregoing, the appropriate standard of review in this case is the one set forth by this Court in *Mayes v. State*, 887 P.2d 1288 (Okl.Cr.1994). In *Mayes*, the State's evidence was solely circumstantial, but the defendant testified as to his version of what happened.[6] We determined that the evidence should be reviewed in the light most favorable to the State to determine whether any rational trier of fact could find the elements of the crime charged beyond a reasonable doubt. *Mayes*, 887 P.2d at 1303; *Spuehler v. State*, 709 P.2d 202, 203–04 (Okl. Cr.1985). We find, using this standard, that the evidence presented here was sufficient to find the existence of the murder-to-avoid-arrest aggravator.

The trial court, after listening to the evidence, determined that Petitioner had

planned the robbery: the victim's store was the only one where Petitioner and the victim were alone together for some period of time (all of the other stores had several other customers present during the time Petitioner was in them); Petitioner lured the victim into the back room of the store in order to kill him; and, the murder was cold blooded and not the result of an impulse.. The record also indicated Petitioner was well known to the victim, who could have easily identified him and he was familiar with the store where the robbery and murder took place; he claimed he had gone to the store to buy something although at the time of his apprehension and arrest he had no money with him; he left the scene of the crime and disposed of the murder weapon along a highway; and despite claims that he was headed home at the time of his arrest, Petitioner was found in Stigler, Oklahoma, several miles in the opposite direction from his place of residence. A rational fact finder could have found the elements of the aggravator beyond a reasonable doubt.

Petitioner also alleges there was insufficient evidence to establish a predicate crime upon which the murder-to-avoid-arrest aggravator was based. Citing *Barnett v. State*, 853 P.2d 226, 233–34 (Okl.Cr.1993), Petitioner claims he cannot be found to have murdered Kelley to avoid arrest because the force used to accomplish the robbery was a significant contributing cause of the victim's death, not a separate crime. We do not find Petitioner's argument persuasive. The facts of the *Barnett* case make it particularly inapplicable to the case before us. In *Barnett*, as Petitioner notes, we found when crimes such as assault and battery or feloniously pointing a firearm, constituted part of the actions that resulted in the death of the victim, they were not separate and distinct from the murder itself. However, in *Barnett*, we specifically cited cases where predicate crimes were separate and distinct offenses, noting that murder committed to avoid prosecution for robbery constituted one of those crimes. *See, Barnett*, 853 P.2d at 233, n. 2 (citing *Fox v.*

---

**6.** *Mayes* does not specify what Appellant testified to at trial, only that he took the stand in his own

defense. Regardless, the analysis is the same.

*State,* 779 P.2d 562 (Okl.Cr.1989) (defendant sought to avoid prosecution for robbery by murdering the victim.)) The evidence presented here was sufficient to support the State's claim that this murder was committed to avoid arrest or prosecution. We find no error here.

■■■■ In Proposition VI, Petitioner alleges that his plea of nolo contendere was not knowing and voluntary. He claims the trial court improperly advised him of the elements of first degree felony murder, and that the plea was not supported by a sufficient factual basis.[7] This Court has determined that trial judges should observe the guidelines set forth in *King v. State,* 553 P.2d 529, 535 (Okl.Cr.1976) in accepting a defendant's guilty plea. The findings of the trial court should be enunciated on the record for review to preclude any question on appeal. This same procedure is to be followed in determining the validity of a plea of nolo contendere. *Ocampo v. State,* 778 P.2d 920, 923 (Okl.Cr.1989); *Wester v. State,* 764 P.2d 884, 886 (Okl.Cr.1988).

A review of the record in this case indicates *King* guidelines were followed, and a sufficient factual basis established to accept the plea. The trial court satisfied itself as to Petitioner's competency and asked him if he understood the proceedings. In response to Petitioner's affirmative answers, the court then verified that Petitioner understood the consequences of his plea and the elements the State would be required to prove if the case went to trial. After determining that the plea was not the result of coercion, and after an offer of proof was made which included a summary of the testimony of approximately fifteen witnesses, the trial court found sufficient evidence had been presented to accept the no contest plea. We find no error here.

■■ Petitioner also alleges the trial court improperly informed him of the elements of the crimes charged, requiring this Court to vacate the judgment and sentence and allow Petitioner to withdraw his plea. He claims that the trial court improperly stated that the crime of felony murder that he was charged with was "murder committed in the course of a robbery." Admittedly, the trial court could have chosen its words more carefully. However, the allegation that Petitioner was unaware he was charged with felony murder, the underlying felony being robbery with a dangerous weapon, is not borne out by the record.

The portion of the Information charging Petitioner with felony murder, alleged the underlying felony of Robbery with a Dangerous Weapon, claiming Petitioner killed Kelley with a knife. Combined with the information produced at the preliminary hearing and the extensive offer of proof elicited at the plea hearing, we are unable to conclude that Petitioner did not understand the charges filed against him. Moreover, after extensive questioning from the trial court, Petitioner repeatedly affirmed that he understood the crimes with which he was charged, and that he had discussed the same with defense counsel. We find that the plea was knowingly and voluntarily entered.

■■ Finally, Petitioner claims that the evidence presented was insufficient to support the charge of malice murder. While he admits that his statement to police was an admission that he killed Kelley without provocation, Petitioner now claims that his "diminished capacity" at the time of the murder rendered him incapable of forming the intent necessary to support the first degree malice murder charge. Recognizing that Dr. Murphy's testimony was not presented at the plea hearing, we still find no error.[8]

7. The allegation here was that since the items placed on the counter in the store were not taken, there was no robbery. Simply taking the gas, Petitioner alleges, is not robbery. This issue was explored by the Court both here and at oral argument. We find the argument unpersuasive in that even if we were to determine that there was no robbery, the crime was charged in the alternative, and included a charge of malice murder. The trial court specifically found Petitioner guilty of malice murder, therefore whether the underlying felony of Robbery with a Dangerous Weapon was proven in this case is moot.

8. We are cognizant of the fact that the plea was entered on the day trial was to begin. Petitioner was prepared to present the "diminished capacity" argument and had a witness available to testify to the same. Dr. Murphy subsequently testified at Petitioner's sentencing hearing.

We disagree with Petitioner's characterization of Dr. Murphy's testimony. While the testimony at the sentencing hearing was that Petitioner possibly could have suffered a seizure during the killing, cross-examination revealed that Petitioner had never suffered such a seizure, and it was just as likely as not that he suffered no seizure at the time the murder was committed. Petitioner carried a hunting knife into the store where Kelley was working alone. He had no money with him, yet he "purchased" $43.00 worth of gas and numerous other items. He decided, at the last minute, that he needed minnows for fishing, which required the victim to ·enter the back room of the store, hidden from the view of anyone else who might enter. Petitioner stabbed the victim, without provocation, and when confronted by Parsons and Yort while leaving the back room just moments after the crime, told the two men that Kelley was in the cooler on the other side of the store, and that he (Kelley) did not allow ·anyone into the back room of the establishment. Petitioner left the store and drove away, and kept driving until stopped by the police.

The evidence presented was sufficient to support the factual basis for malice murder. More importantly, Petitioner's actions immediately after the crime indicate no "diminished capacity" and, in fact, support the description of Petitioner as a methodical thinker.

We have long held that the protections of *King* do not require mechanical compliance, (*see, State v. Durant,* 609 P.2d 792, 793 (Okl.Cr.1980)), and we do not require the trial court to undertake some sort of formal ritual in order to satisfy the minimum standards of due process when accepting a guilty plea. *Ocampo* 778 P.2d at 923. Instead, as we stated in *Berget v. State,* 824 P.2d 364, 370 (Okl.Cr.1991), we will examine the entire record before us to determine whether the guilty plea was entered in a knowing and voluntary manner. *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). According to the record, there is no evidence this plea was not voluntarily entered. We find no error here.

We will address Proposition VII in conjunction with Proposition VIII, as the two address different aspects of the same claim. Proposition VII advances the theory that Petitioner's plea was involuntary, because defense counsel's performance of his duties was deficient, rendering him ineffective. As such, Petitioner claims he should have been allowed to withdraw his plea. At Proposition VIII, Petitioner alleges the district court judge who presided at his hearing on the motion to withdraw his plea exceeded and abused his authority and violated Petitioner's Fourteenth Amendment rights.

The decision to allow the withdrawal of a plea is within the sound discretion of the trial court and we will not interfere unless we find an abuse of discretion. *Hopkins v. State,* 764 P.2d 215 (Okl.Cr.1988); *Vuletich v. State,* 735 P.2d 568 (Okl.Cr.1987); *Ligon v. State,* 712 P.2d 74 (Okl.Cr.1986). There is no error identified here which would justify a finding that the trial court abused its discretion in denying Petitioner's request to withdraw the plea. *Frederick v. State,* 811 P.2d 601 (Okl.Cr.1991).

Judge Steven W. Taylor heard the motion to withdraw plea, and at the conclusion of the argument noted, on the record, that he did not believe the testimony of Petitioner's trial counsel, Paul Faulk, and his investigator, Karen Billings. Defense counsel claimed at the hearing that his performance as Petitioner's counsel amounted to ineffective assistance. Mr. Faulk testified that he allowed Petitioner to believe that if he entered a plea he would not receive the death penalty, and that Faulk misled Petitioner into believing that the death penalty was not a possibility. Billings testified she told Petitioner there was "no way" he would get the death penalty if he entered a plea.

There is no support in the record for either the claim that counsel was ineffective or that Petitioner was misled either by counsel or his investigator into believing that he could not receive the death penalty if he entered a plea. The record is replete with numerous filings, motions, and pleadings indicating that counsel was more than proficient in the exercise of his duties. Testimony at the hearing on the motion to withdraw established Faulk's expertise in death penal-

ty cases, his continuing assignment to those cases (even after Petitioner's case had been pled), and his experience as more than competent defense counsel. The record also revealed Faulk's deep disappointment with this case, in particular, being prosecuted as a "death case," and he relayed that frustration and anger to the trial court during the hearing.

Judge Taylor termed the motion to withdraw and the hearing on the same, at various times, to be a "Wewoka switch" and "shell game" spurred on by defense counsel's belief that the case did not warrant the death penalty. He further noted that Petitioner did not even appear at the withdrawal hearing to either confirm or deny the testimony given by counsel Faulk and investigator Billings, or to explain to the trial court what he did or did not understand, or what he was or was not told.

Petitioner's conclusion is that the trial court's reaction to the motion to withdraw had a "chilling effect on Mr. Carpenter's exercise of his rights under Oklahoma and federal constitutional law." He asserts that the trial court's conclusions are unsupported by the record and appear to have been drawn from some "preconceived bias against the procedure rather than the evidence that was presented at the hearing."

A review of the record does not support Petitioner's contention. Initially, we find it difficult to conclude that the trial court's behavior and reaction to the motion, as presented, could have had a "chilling effect" on a defendant who was not even present for the hearing. Moreover, since Petitioner does not identify what rights he was unable to exercise due to this "chilling effect," we find, once again, that we are confronted with a claim of

alleged error with no injury. Secondly, the record on the motion to withdraw is replete with references to defense counsel's dissatisfaction with the system, his personal belief that this was "not a death case" and that Petitioner's sentence should have been life, as well as his recitations as to the years of experience he has had in handling death cases.[9] The trial court was offended, but not by the process of plea withdrawal. Rather, the court was incensed at what it saw as a blatant attempt by defense counsel, dissatisfied with the sentence his client received after entering a valid plea, to manipulate the judicial system through a motion to withdraw that same valid plea in an effort to reach a different result.

The record of the plea was quite clear. Petitioner indicated he was aware not only of the charges against him, but also understood that by entering the plea he was subject to punishment of either life, life without parole, or death. There is nothing in the record to support the claim that Petitioner was misled regarding the plea agreement, or that he was not fully aware, at all times, that the death penalty was a possibility. Likewise, there is nothing in the record supporting the claim of ineffective assistance of counsel. Even Faulk refused to admit that he told Petitioner there was "no way" he would receive the death penalty if he entered a plea. In fact, testimony from a jail guard who spoke with Petitioner revealed that Petitioner not only knew that the death penalty was a possibility, but had resigned himself to the fact the sentence would be decided by the court. Having examined the record before us, we cannot say that the representation afforded Petitioner during the proceedings fell below the standard established in *Strickland*.[10]

---

**9.** It is also interesting to note that despite his claims of incompetence, defense counsel, at the time of the motion hearing, was still employed by the Oklahoma Indigent Defense System and still in charge of several death penalty cases.

**10.** We judge claims of ineffective assistance of counsel in light of the Supreme Court's guidelines established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We considered the application of the test in *Pierce v. State*, 786 P.2d 1255, 1266–67 (Okl.Cr. 1990), and held:

We have long held that allegation of incompetency of counsel will be judged by "whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance." *Fisher v. State*, 736 P.2d 1003, 1011 (Okl.Cr.1987); *Cotton v. State*, 679 P.2d 1305, 1308 (Okl.Cr. 1984). In review of such a claim, we are to accord a strong presumption that counsel was at least constitutionally competent. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We will not make this judgment in hindsight, second guessing coun-

The determining criteria is whether, but for counsel's alleged omissions or commissions, the result of the trial would have been different. We do not find these criteria here.

There was no abuse of authority with regard to the motion to withdraw the plea, and there is nothing present in Petitioner's argument supporting his claim that his constitutional rights were violated. We find no error here.

■ At Proposition IX, Petitioner claims the sentence of death is "inherently unreliable" because the evidence presented in support of the aggravator was outweighed by the mitigating evidence, and because the trial court was unaware that it could impose a lesser sentence even if it determined that the aggravating circumstances outweighed the mitigating circumstances.

With respect to the second assertion, Petitioner cites to the trial court's statements concerning the imposition of the death penalty and the weighing of aggravating and mitigating circumstances, as proof that the trial court was unaware that it could impose a sentence less than death.[11] While the choice of words may have been somewhat inartful, we do not find, from the excerpt presented or anything else in the record, that the trial court felt it had no choice but to impose the death penalty. An alternative, and equally acceptable interpretation of the same excerpt, would be that the trial court was explaining that only if the State proved that the aggravating circumstances outweighed the mitigating circumstances would the death penalty be imposed. Anything less would mean that the penalty choices were either life or life without parole.

Additionally, we have previously stated that unless proven otherwise, we will presume the trial court knows the penalty procedures involved in capital sentencing. *Berget*, 824 at 375. The presumption here is that the trial court followed the law, and the citation from the record presented does not prove that the trial court did not understand the law or that the death sentence was imposed due to a misconception of what the law requires and/or permits. We find no error here.

■ In examining whether the aggravating circumstance presented here outweighed the mitigating factors presented on Petitioner's behalf, we examine the record according to the criteria established in *Fisher v. State*, 736 P.2d 1003, 1011 (Okl.Cr.1987). In *Fisher* we stated:

[T]his Court will review such evidence only to the extent necessary to determine whether there was sufficient evidence from which a rational sentencer could find that the balance of aggravating and mitigating circumstances warranted a death sentence.

We analogized the *Fisher* standard to the *Spuehler*[12] sufficiency of the evidence standard.

The trial court, after listening to the evidence, made the following determinations:

—Petitioner was not suffering from any mental distress, seizure or disorder at the time the crime was committed;

—Petitioner had planned the robbery, bolstered by testimony from several other convenience store owners/employees who saw Petitioner in their respective stores the day of the robbery/murder, acting suspiciously;

---

sel's trial strategy. *Dutton v. State*, 674 P.2d 1134 (Okl.Cr.1984).

11. The language cited by Petitioner comes from the sentencing hearing transcript, is cited piecemeal, spans several pages and reads as follows: The law is that if the State proves beyond a reasonable doubt an aggravating circumstance. [sic] And if the State proves the aggravating circumstance outweighs the mitigating circumstance the penalty shall be death. If not, of course, if the State fails to prove an aggravating circumstance or if the Court finds that the mitigating circumstance is not outweighed by the aggravating circumstance then the penalty

is either life imprisonment or life imprisonment without parole. . . .

I find beyond a reasonable doubt that the Defendant Mr. Carpenter murdered Mr. Kelly for the purpose of avoiding or preventing a lawful arrest or prosecution. I find that the aggravating circumstance of the crime outweigh [sic] the mitigating circumstances presented. I hereby pass sentence of death upon Mr. Carpenter and direct that Mr. Carpenter be executed.

12. *Spuehler v. State*, 709 P.2d 202, 203–204 (Okl. Cr.1985).

—The victim's store was the only one where Petitioner and the victim were alone together for some period of time (all of the other stores had several other customers present during the time Petitioner was in them);

—Petitioner seemed to be thinking clearly a the time he was confronted by witnesses Yort and Parsons immediately after the murder;

—Petitioner lured the victim into the back room of the store in order to kill him; and

—The murder was cold blooded and planned, and not the result of an impulse.

Petitioner left the scene of the crime and disposed of the murder weapon along a highway. Petitioner knew the victim and was familiar with the store where the robbery/murder took place. Petitioner claimed he had gone to the store to buy something although at the time of his apprehension and arrest he had no money with him.

While there was testimony indicating the possibility Petitioner might have had a seizure at the time the crime was committed, cross-examination revealed that the seizure claim was speculation (based on Petitioner's numerous head injuries suffered over a period of years), and it was quite possible Petitioner never had experienced such a seizure, either at the time of the murder or any other time. Food discovered in a bag on the store counter immediately after the murder was still warm, indicating Petitioner had heated it up, intending to take it with him upon leaving the store. The gas pump outside reflected that several gallons of gas had been pumped, in an amount sufficient to fill both tanks on the Petitioner's truck.

In mitigation, Petitioner put on evidence that he was always a good student, that he never caused trouble either at home or school, he had no prior arrests, and no prior history with law enforcement, in any capacity. He claimed that he did not remember the stabbing, and did not know why he had killed the victim, stating "it could have been anybody." On cross-examination, mitigation witnesses also testified that Petitioner was the type of person who thought things through and made rational decisions.

We cannot say from examining the record that the evidence presented in support of the aggravating circumstance of avoiding arrest was outweighed by the mitigating evidence. We are unable to say that a rational sentencer could not have reached the conclusion that death was the appropriate sentence in this case. We find no error here.

■ Finally, Petitioner contends at Proposition X that his death sentence must be vacated because the victim impact evidence used at the sentencing hearing violated his constitutional rights. Petitioner claims the interjection by the victim's son as to his opinions concerning the circumstances of the crime and the appropriate punishment were improper and created a "constitutionally unacceptable risk that the sentence was imposed in an arbitrary and capricious manner." Petitioner further claims that victim impact evidence is irrelevant and should be excluded entirely.

Petitioner does not deny that the introduction of victim impact evidence is proper and admissible in evaluating the crime committed. This Court has affirmed that, when admitted in the manner contemplated in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), victim impact evidence is proper. *Mitchell v. State,* 884 P.2d 1186, 1204 (Okl.Cr.1994), *Freeman v. State,* 876 P.2d 283, 289 (Okl.Cr.1994); *Neill v. State,* 896 P.2d 537 (Okl.Cr.1994). Having considered and approved the introduction of proper victim impact evidence, we will not reconsider the issue here.

■ With respect to his complaint that the introduction of the evidence swayed the trial court to impose a sentence it might not have otherwise, there is nothing in the record to support Petitioner's assertion. The record is quite clear as to the factors the trial court used in making its decision to impose the death penalty. It should also be remembered that the decision maker in this case was a judge, not a jury, and, as indicated above, we will presume that the decisions made by a trial court with respect to sentencing were in compliance with the law. Petitioner points to nothing in the record showing the decision to impose the death penalty was the result of the victim impact statement, or that, absent the statement, the punishment would not have been the same. We find no error here.

**MANDATORY SENTENCE REVIEW**

Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the judge's finding of an aggravating circumstance as enumerated in 21 O.S.1991, § 701.12. After carefully weighing the aggravator and all mitigating evidence, we have determined that the murder-to-avoid-arrest aggravating circumstance upon which the death penalty was based was factually substantiated, and amply supported by the evidence presented at trial. We further find no indication in the record that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

We find no error present in Petitioner's case warranting reversal, modification or dismissal, and therefore **AFFIRM** the judgment and sentence of the trial court, and **DENY** the Petition for Certiorari.

JOHNSON, P.J., CHAPEL, V.P.J., and LUMPKIN, J., concur.

STRUBHAR, J., recused.